## BLEVINS & HORTON v. THE BANK AT DECATUR.

1. The Decatur Bank, by its agents, entered into an agreement to take a tract of land belonging to B, one of its debtors, "at its fair cash value," to be ascertained by five persons who were selected by the parties—the land to be paid for by the debt due the bank from B; and the residue in the notes of the Bank of the State of Alabama—The persons agreed on, estimated the value of the land at thirteen dollars per acre, payable in Alabama bank notes, which were then at a discount of from twenty-five to thirty per cent.—*Held,* that the true construction of this contract was, that the land was to be taken by the bank at its cash money value in the market, and that the notes of the Bank, and the debt of B. were to be considered as money in payment of the land—that a court of chancery would not enforce a specific performance of the contract, because, by the mode adopted to ascertain the cash value of the land, the debt of B. and the notes of the Bank were not considered as money, but were, in effect, scaled by the supposed difference between them and specie, by the appreciated price put upon the land, over and above its supposed value in money; thus defeating the entire object of the Bank in making the contract.

Error to the Chancery Court of Morgan county.

The bill was filed by the plaintiffs in error, and alleges that the defendant Blevins being indebted to the Bank at Decatur, in the sum of $9,589 46, and being in failing circumstances, so that he could not pay the debt, or any material part thereof, without the aid of his friends, on the 25th Sept. 1842, made a proposition in writing to the Bank, of which the following is a copy:

"Huntsville, Sept. 25, 1842.

"GEO. W. RICE, Esq.

Dear Sir: Mr John Blevins, who is anxious to pay the debt due the Decatur Bank, authorizes me to make to the board of directors the following proposition, viz: The Bank to take his tract of land, containing 2,465 acres, lying in this county, at cash valuation, the same to be ascertained by three or five respectable persons living in the neighborhood, who know the land, such men as Stephen Debose, Wm. Wright. and others, as may be agreed on. Should the land be valued for more than he owes the Bank, the overplus to be paid to him in cash; possession given first of January next. Title to be entirely satisfactory to the

48

Bank before any payment is made. The board to decide at their first meeting after the receipt of this, whether they will accept the proposition or not. If the Bank accepts the proposition, an agent to be sent up immediately, to attend to valuation, &c.

That the Bank soon after, accepted the proposition, appointing G. W. Rice, its cashier, and L. G. Garrett, one of its directors, its agents, by an order of the board, as follows:

"Branch of the Bank of the State of Alabama at Decatur, 10th Nov. 1842. Ordered that the cashier, in company with Lewis G. Garrett, repair to Huntsville, at the earliest day practicable, with the view of effecting a settlement of the debt due by John Blevins, in any way, so as to secure the amount, or any portion thereof, and for that purpose, they, or either of them, are vested with full power and authority to contract." That after the adoption of said resolution, said president and directors instructed said agents to make the best arrangement they could, and if nothing better could be done, then to take said land upon the terms proposed.

That said agents repaired to Huntsville, when, being unable to make any arrangement other than that proposed, agreed with said Blevins to take the land upon the terms offered, but as the legal title was then in said Horton, it became necessary that he should be a party to the agreement. Thereupon, complainants entered into a written agreement with the agents of the Bank, as follows:

"Memorandum of an agreement, this day entered into by and between John Blevins and Rodah Horton, and the Branch of the Bank of the State of Alabama at Decatur—Witnesseth, that said Blevins is indebted to said Bank by note, in the sum of $9,589 46, due on the 31st January, 1842, besides interest and costs, and in the further sum of $746 86, besides interest and costs, for which last mentioned sum, said Bank has judgment and execution, and said Bank agrees to take from said Blevins in payment for said sums, a certain tract of land, lying in Madison county, supposed to contain about twenty-five hundred acres, (the true number to be ascertained hereafter) at the price to be set thereupon by the persons hereinafter selected and named.— But inasmuch as the legal title to said land is now in said Horton, and in consideration that said Horton shall make to said Bank a good and sufficient title to the same, said Bank agrees to pay to

said Horton in notes of the Banks of the State of Alabama, the whole of the residue of the ascertained value of said land, left after paying said sums of money, with the interest and costs as aforesaid, and in consideration of the payment by the Bank of such residue, left as aforesaid, said Horton on his part, agrees to make to said Bank, good and sufficient deed or deeds, for the whole of said tract of land. Now, to carry out and fully execute this agreement, said parties have mutually chosen and selected the following persons: Thomas Brandon, William Brandon, Benjamin Patterson, William Wright and Levi Hinds, who shall, on Monday, the 21st November inst. or as soon thereafter as may be, go upon said tract of land, and after a full and accurate examination of said land, fix upon the fair cash value, and reduce the same to writing, and give to each of the parties a copy thereof; and in case of disagreement, the opinion of a majority shall be the award of the whole, and binding upon the parties, and each party hereby binds himself faithfully, to execute on his part, this agreement.          JOHN BLEVINS,

L. G. GARRETT,

GEO. W. RICE,

RODAH HORTON.

That a short time after the agreement was made, the persons so selected, did go upon said land and examine it, and four of the five estimated and fixed the value of the land at thirteen dollars per acre, reduced the assessment to writing, and gave to each of the parties a copy thereof. That after the valuation was thus made known to the cashier and Garrett, they as such agents, expressly recognized it as good, fair, and binding, and adopted it as their own act and valuation, and fixed a day certain, when said Horton should go to the Bank to execute the necessary deeds of conveyance, and receive from the Bank said residue.

That by a survey, said tract was found to contain 2,466 37-100 acres, of which the Bank had notice—that on the day appointed by the agents, Horton went to the Bank and offered to execute the agreement on his part, but the Bank refused to perform on its part the agreement of its agents, but by its president and directors, adopted the following resolution, on the 30th Nov. 1842: *Resolved*, that in the opinion of this board, the debt of John Blevins, which was intended to be secured by the purchase of his land, will be wholly lost by the contract made by George

W. Rice, and L. G. Garrett, and the subsequent valuation; therefore, said contract will not be recognized, sanctioned, or fulfilled by this board."

The complainant, Horton, avers his readiness and willingness, and his ability, to make a good title to the land on the payment of the residue, and both prays a specific performance of the contract, and that the Bank be enjoined from collecting the money from Blevins. Appended to the bill, is a plat of the land and survey.

The Bank, by its answer, admits that the proposition was made as stated in the bill, but denies that it was accepted by the Bank, and sets out the resolution stated in the bill, for its action thereupon. It does not admit that any instructions were given to the agents, other than those to be found in their instructions. Admits the agreement was made by their agents, set forth in the bill, but does not admit the agents sanctioned and approved of the valuation made by the referees.

Does not known whether complainants were able to comply, but admits its refusal, because, by performing it, not only would the debt intended to be saved, be lost, but according to the belief of respondent, complainants would receive in money, more than the actual value of the land; that the land was estimated at twice as much as it would command in the market for cash, &c.

Many witnesses were examined to prove the value of the land, which will sufficiently appear from the statement of the facts by the court.

The chancellor considering that the agents exceeded their powers, and that the proof established satisfactorily, that the land had been estimated by the valuers, at a price considerably beyond its true value, dismissed the bill. The complainants prosecute. this writ, and assign for error the decree of the chancellor.

Hopkins, McClung, S. Parsons and Robinson, for plaintiffs in error, contended that this was a proper case for a specific performance—that excess of price over value, was no reason for not performing the contract specifically, unless the difference was so great as to shock the understanding, and to furnish evidence of fraud, or imposition. [1 Story's Equity, 249, § 244–5–6; 3 Cow. 445; 5 Porter, 264; 6 Wheaton, 528; 7 Vesey, 202; 1 Cox, 383, 428; 3 V. & B. 187; 9 Vesey, 246; 16 id. 512; 6 id. 272; 7 id. 30; 8 id. 133; 2 Madd. R. 409.] But the proof did not establish any

such inequality, but on the contrary, showed that the price was fair.

The award made by the referees, can only be impeached by proof of fraud or misconduct.   [4 Porter, 65; 3 Johns. 367; 10 id. 143; 1 John. C. R. 101; 2 id. 276, 339, 358, 551; 5 Vesey, 846; 1 id. 369; 2 Johns. 62.]

The Bank had power to make such a contract.   [Angel & Ames on Cor. 64, 93; Clay's Dig. 112, § 46; id 120, § 8, 122, § 2.]

The directors had the right to delegate their powers, and when properly exercised, was binding on the Bank.   [Angel & Ames, 174–5–6, 237–8; 19 Johns. 60, 284; 14 ib. 118; 10 id. 84; 12 id. 231; 7 Cranch, 306; 12 Wheaton, 72; 1 Hals. 115; 3 id. 191; 4 S. & R. 6; 3 Mass. 364; 10 id. 397; 2 Ala. Rep. 452, 718.]

The time of performance of contract, not material, unless some fact set out in the answer, such as change of value, or situation of the parties makes it so.   [6 Wheaton, 528; 5 Cranch, 262; 3 Merivale, 81; 7 Vesey, 202, 264, 278; 13 id. 287; 2 S. & L. 682; 7 Paige, 77; 3 Bibb, 367; 6 Vesey, 646; 20 Law Lib. 106–8.]

If the title was considered doubtful, it should have been referred to a master, and upon objections to his report, the court could have investigated the title.   [6 Vesey, 646; 7 id. 202; 3 Cowen, 445; 3 Mun. 317; 8 Con. Eng. C. 210; 4 id. 230; 4 Johns. Ch. R. 659; 1 Hopkins, 436; 2 P. Will. 198; 20 Law Lib. 102–3–4, 222; 1 V. & B. 224, 351, 516; 10 Vesey, 315; 11 id. 39; 12 id. 17; 18 id. 482; 1 Wheaton, 179; 1 Merivale, 19, 104; 2 id. 138; 7 Paige 77; 2 Russell, 570.]

COOPER, *contra*—contended that the directors of the bank were trustees for the public, and could not delegate their powers in such a case as the present.   [26 Wendell, 485; 3 Louisiana, 568; 4 Mass. 595; 6 Paige, 497.]

That in this case, the agents exceeded their powers, and their act was not binding on the Bank.

Where a matter concerns the public, courts will not decree a specific performance, unless the bargain is beneficial to the trust fund.   [2 Hov. on Frauds, 12, 40, 253–4; 1 Mad. C. R. 401; 17 Ves. 290; 18 id. 315; 3 P. Will. 282.]

A specific performance is in the sound discretion of the court, and will not be decreed unless the contract is just, fair and reasonable, which is not the case here.   [6 John. C. 111: id. 222; 3

Cow. 445; 4 Porter. 374; 2 Ala. 83; 2 Wheaton, 290; 5 Peters, 264.]

In such a case as the present, time is material, and if the vendor is unable to make title at the time stipulated, he cannot afterwards enforce the contract. [1 Caines, 47; 1 Dallas, 428; 5 Johns. 85; 11 ib. 527; 2 Brockenbrogh, 246; 1 John. C. R. 370; 4 Porter, 385.] The counsel then went into an elaborate examination of the title, tending to show that it was bad, and that the contract was too vague and indefinite in not describing the land to be specifically enforced.

ORMOND, J.—The authority conferred on the agents of the Bank by its order of the 10th November, 1842, did not warrant the agents in making the contract, which they afterwards entered into with Blevins & Horton. It is, however, alleged in the bill, that subsequent instructions were given to the agents by the president and directors, to make a contract conformable to the proposition made to the Bank in writing, on behalf of Blevins, on the 25th Sept. 1842. This is not admitted on the part of the Bank, but there is some proof showing that some further instructions or advice was given by the Bank authorities, and without, therefore, intending to intimate whether these subsequent instructions are to be considered as controlling or vacating the first, or that they were or were not, binding on the Bank, we shall proceed to consider whether this is such a contract as this court can be called on specifically, to enforce, and if it is of that description, then whether the complainants are in a condition to call for the aid of a court of chancery.

In the case of Gould, ex'r of Hayes, v. Womack and wife, [2 Ala. 83,] we had occasion to examine the question of the extent of the authority of this court, in enforcing a specific performance of a contract, and its obligation to act in such cases; that case was one of great importance; the leading cases on the subject, English and American, were examined; and the doctrine, as it is understood at the present day, is thus summed up: "A court of equity will not lend its aid to enforce a specific performance of an executory contract, unless it is just, reasonable in all its parts, and founded on adequate consideration;" by this rule we propose to test the contract here sought to be enforced.

It is quite material to a proper understanding of this case, to

consider the respective attitude of these parties, and the object in view in making the contract now sought to be enforced. Blevins was the debtor of the Bank, in about the sum of $10,000, and although in possession, as nominal owner, of a large tract of land, was in doubtful circumstances. A proposition is made on his behalf, to the Bank, to pay his debt due the Bank, by a sale of his land to the Bank, at "cash valuation." To carry this proposition into effect, certain persons are agreed upon, a majority of whom are to fix upon the "fair cash valuation" of the land, which the Bank is to take at their assessment, and pay the residue after discharging the debt due the Bank, in "notes of the Banks of the State of Alabama."

This proposition, if made in good faith, impliedly asserts that, upon a resale, the Bank will be able to obtain payment of its debts and be refunded, the excess paid upon the purchase. Although it may be admitted that the Bank was willing to submit to some sacrifices to obtain payment of a doubtful debt, such a result would not necessarily have followed, if the terms of the agreement had been fairly complied with. Every one knows the difference in price between a sale for cash and one on credit, although interest is to be paid from the day of sale; and thus, by a resale on credit, the Bank might have reimbursed itself if it could have obtained the land at its fair cash value. That the terms, *fair cash value*, must be considered, in this contract, as equivalent to *fair cash price*, will be evident, when it is considered that the design was to obtain payment of a debt—that the Bank did not want the land for cultivation, and could not use it in that mode; and that it was contemplated by all the parties, certainly by the Bank, to repay itself by a resale; but to produce this result, or to approximate to it, it was essential that the price should not be greatly over-estimated.

The bill does not allege that the land is worth, or will sell for the price put upon it by the valuers, but that "the persons selected, fixed and assessed the value of the land at thirteen dollars per acre;" whilst the Bank, in its answer, alleges, that the land was so grossly overvalued that, by a compliance with the terms of the contract, more than the entire debt intended to be secured, would be lost. Eight persons, who had been examined by the complainants, state the land to have been worth, at the time it was valued, thirteen dollars per acre; whilst of three persons ex-

amined by the Bank, two estimate its value at from fifteen to eighteen thousand dollars, and one, who was one of the original valuers, estimated it at ten dollars per acre, making a difference between the price fixed by the valuers and the two first named, of about fifteen thousand dollars, and of the last, of about eight thousand dollars.

Although, from the nature of the subject, it does not admit of a precise estimate, yet this extraordinary discrepancy between witnesses of equal credit, can only be explained on the supposition, that one or the other side has adopted an erroneous standard or estimate of value—either by some supposed difference between value and price, or by depreciating the medium in which it has to be paid, and which would require an increase of the nominal value of the land, so as to make the medium, in which payment was to be made, approximate to its real value; and upon looking into the depositions, such appears to be the fact.

The proper interrogatory to be put to the witnesses, would have been, *if you are acquainted with the land in dispute, state what was its fair cash value or price in the market at a given time.* The interrogatories which were put, are, after inquiring whether the witnesses were not acquainted with the land, whether it was not fertile and possessed of fine water power, "in view of the goodness of the soil and said water power on it, what would have been the value of said land in November last, to be paid for in Alabama bank notes? Was it not worth, at that time, thirteen dollars per acre, to be paid for in Alabama bank notes? If not, how much?" The manifest tendency of these interrogatories was to lead the mind of the witnesses from the true inquiry, the cash market price of the land; and, accordingly, we find that they answer, that the land was *richly worth thirteen dollars per acre, payable in Alabama bank notes,* which, at that time, were at a discount of from twenty-five to thirty per cent.; but not one of them intimates his belief that it would have commanded that price in the market, or that they were willing, if they had desired to purchase, to give that price for it. The witnesses on the other side, in answer to the interrogatory, what was the fair cash value of the land, say—One of them, that he had desired to purchase it, and never would have given more than fifteen thousand dollars for it, which he thinks its full value. Another says, that about seventeen or eighteen thousand dollars would have been a full

Blevins and Horton v. The Bank at Decatur.

price for the land.   The third, who was one of the valuers, says that he valued the land at ten dollars per acre.

These opposite and contradictory opinions can only be reconciled, by supposing that the complainant's witnesses were speaking of the *value* of the land from its fertility and its water power, without reference to its market price, and especially by considering the *medium* in which the land was to be paid for, as affecting its value.   The notes of the bank, though, at that time, from the operation of temporary causes, at a heavy discount, were payable in *specie,* which could have been coerced from the bank; and it was, therefore, most unjust to adopt such a rule—not only for the reason just assigned, but also because it was uncertain and fluctuating.   The rate of discount, then supposed to exist, might, by the same arbitrary dictation of public opinion, have been reduced to the specie standard on the succeeding day.

A more serious objection than this is, that this mode of valuing the land, violates the agreement of the parties.   It could scarcely be supposed, that the Bank would make such a suicidal contract as voluntarily to agree to purchase property to obtain payment of a debt with its own notes at a ruinous depreciation, when, by the very process, the debt intended to be secured would be entirely sunk.   Certainly the terms of a contract, from which such a result is to flow, should be very clear and explicit.   The contrary appears to us to be the clear meaning and intention of the parties.   The Bank was to take the land at its fair cash value, and was to pay for it, in part, by the debt of Blevins, and the residue, in the notes of the Bank.   This shows very conclusively, that the debt of Blevins and the notes of the Bank were to be considered, in the purchase of the land, as money.   Blevins could hardly have asked that his debt to the Bank should not be considered as cash, or its equivalent; and the notes of the Bank were, in fact, the ordinary circulating medium of the country passing as money, and upon which the Bank could be compelled to pay specie.   If it had been the intention of the parties, that the debt of Blevins and the notes of the Bank were not to be considered in the purchase as money, but subject to such an enormous discount, as appears at that time to have been current, it is impossible to suppose it would not have been expressly provided for; and in the absence of any such provision, we are constrained to believe it was not in the contemplation of the parties; the more

especially, as such a stipulation would, in its consequences, in all probability, have extinguished the debt intended to be secured, and, indeed, might have imposed on the Bank an additional loss, without the possibility of being a gainer by it.

If the contract was as the complainants suppose it to be, it might well be questioned, whether a specific performance could be enforced; but the ground of this decision is not that the contract, properly interpreted, might not be enforced in chancery, but it is, that the complainants do not show that they have complied, or offered to comply with it, on their part, by tendering to the Bank the land agreed to be received by it at its *fair cash value.* Nor are we to be understood as deciding that, in ascertaining *the fair cash value of the land,* we would weigh the opinions of those persons agreed upon by the parties to estimate its value in "gold scales." Upon such questions, men may be expected to differ, and nothing but an actual sale could ascertain the fact with certainty. In such a case as this, however, there must be an approximation to the cash price of the land, to entitle the party to the aid of a court of chancery. Some sacrifice the proposition supposes the Bank willing to submit to, and it was reasonable to expect that the land would be estimated at its full cash price.

Here, however, we are not left to grope in the dark as to the relative merit of opposite opinions as to the cash value of the land. The valuers themselves inform us of the rule by which they attained their conclusion, and that, as has been shown, was in violation of the agreement of the parties: and there can be no pretence that the complainants can enforce in equity a contract which, in fact, the Bank never entered into.

These considerations lead us to the conclusion, that the complainants have not made out such a case as to entitle them to relief in equity; and the decree of the chancellor must be, therefore, affirmed.